Beverly Prunty,  
                  Petitioner  

          v.  

Unemployment Compensation  
Board of Review,  
                  Respondent  

:  
:  
:  
:  
:  
:  
:  
:  
:  
:  

No. 1761 C.D. 2019  
Argued: February 10, 2021

BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge  
                HONORABLE MARY HANNAH LEAVITT, Judge  
                HONORABLE PATRICIA A. McCULLOUGH, Judge  
                HONORABLE ANNE E. COVEY, Judge  
                HONORABLE MICHAEL H. WOJCIK, Judge  
                HONORABLE CHRISTINE FIZZANO CANNON, Judge  
                HONORABLE ELLEN CEISLER, Judge

OPINION BY  
JUDGE COVEY                             FILED: May 4, 2021

        Beverly Prunty (Claimant) petitions this Court for review of the Unemployment Compensation (UC) Board of Review's (UCBR) November 26, 2019 order affirming the Referee's decision finding Claimant ineligible for UC benefits under Section 402.1 of the Unemployment Compensation Law (Law).[1] The issue before the Court is whether the Community College of Philadelphia's (Employer) summer term constitutes a "regular term" based on the plain language of Section 402.1(1) of the Law.[2]

        Employer employed Claimant as a part-time adjunct faculty member in its English Department (Department) beginning in 1991. Employer begins academic

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, added by Section 5 of the Act of July 6, 1977, P.L. 41, 43 P.S. § 802.1 (relating to benefits based on service for educational institutions).

[2] Claimant includes a second issue of whether precedent supports the UCBR's decision, which is encompassed in the discussion of the first issue. *See* Claimant Br. at 3.

years with a fall semester, after which is a spring semester, followed by two summer sessions. Enrollment in Employer's courses during the summer sessions is much lower than during the fall and spring semesters and, as a result, Employer offers fewer courses during the summer term. Claimant is a member of a union that has a collective bargaining agreement with Employer providing, among other things, that adjunct, part-time professors or instructors range in seniority from level 1 to level 14, with the highest number having first preference in their departments to bid on work during the summer sessions. Claimant has the highest seniority level in her Department. Further, Employer gives full-time faculty members priority over part-time faculty members, if both are available, to teach summer courses offered in their departments.

Claimant taught courses during Employer's spring 2019 semester, which ended on May 2, 2019. Claimant had a history of returning to her same teaching position each new academic year. On April 24, 2019, Employer issued Claimant a letter stating: "[T]he purpose of this letter is to acknowledge your services during the [s]pring 2019 academic semester . . . . There is a reasonable assurance that you will have the opportunity to perform a similar service during the [f]all 2019 academic semester, dependent upon enrollment, budgetary considerations and performance." Certified Record (C.R.) Item 9, Notes of Testimony, August 15, 2019 (N.T.) at Ex. E-1.

Employer requires part-time adjunct professors and instructors to submit availability forms. Claimant gave Employer her availability form, wherein she stated she was available to teach any course in her Department during both of the summer 2019 sessions. In various summer terms before 2019, including 2018, Employer had sufficient student enrollment, and few available full-time faculty to teach, thereby giving Claimant the ability to bid on and receive more than one course to teach. However, there was a year, 2012, where Claimant did not teach during either summer session.

2

For the summer 2019 term, either due to lack of student enrollment or full-time faculty available to teach in the summer term, there were an insufficient number of courses within Claimant's Department to enable her to teach during both summer sessions. Employer offered and Claimant accepted a course in the first summer session, from May 11 through June 21, 2019, at a pay rate of $3,522.75 for said period. In addition to teaching one summer course, Claimant performed non-teaching work for Employer from June 6 through June 20, 2019, at an hourly rate of pay. Claimant applied for UC benefits.

Claimant received $1,016.00 in UC benefits from May 11, 2019, through June 8, 2019. On June 13, 2019, the Indiana UC Service Center issued a Notice of Determination (Determination) finding Claimant ineligible for UC benefits under Section 402.1(1) of the Law. The Determination stated that Claimant's unemployment commenced during the period between successive academic years and that Employer provided a bona fide offer of work for the next academic year.[3] The UC Service Center also mailed Claimant a Notice of Non-Fault Overpayment (Notice), stating therein that Claimant was overpaid for five weeks because she was ineligible to receive UC benefits for the 2019 summer break due to Employer's reasonable assurance of work in the fall.

On June 20, 2019, Claimant appealed from the Determination and the Notice, stating that she works for Employer year-round, including the summer term, and that her work hours were decreased in 2019 based on the lone class she taught in the first summer session. A Referee hearing was held on August 15, 2019. On August 19, 2019, the Referee affirmed the UC Service Center's Determination and Notice.[4]

---

[3] The Determination stated that Claimant was ineligible for UC benefits "beginning waiting week ending 5/4/2019." C.R. Item 5, Determination at 1. However, because the waiting week ending May 4, 2019, was during the spring semester and not the summer term, Section 402.1(1) of the Law does not apply thereto.

[4] The Referee reversed the portion of the Determination finding Claimant ineligible for UC benefits for waiting week ending May 4, 2019.

3

Claimant appealed to the UCBR. The UCBR affirmed the Referee's decision. Thereafter, Claimant appealed to this Court.[5],[6]

Claimant argues that the reasonable assurance doctrine does not apply herein because Claimant worked for Employer year-round. Specifically, Claimant declares that Section 402.1(1) of the Law only disqualifies her for the weeks at issue if they fall in one of two periods: (1) a break or period between academic years; or (2) a similar period between regular terms. *See* 43 P.S. § 802.1(1). Claimant contends her unemployment did not occur during a period between academic years, as the summer term is clearly included within Employer's academic year. Further, Claimant maintains that, in order to determine whether Employer's summer term constitutes a regular term or a period between regular terms, this Court must examine, as an issue of first impression, the meaning of the word "regular" as it is used in Section 402.1(1) of the Law. Claimant asserts that the plain meaning of "regular" in the context of the statute suggests that "regular terms" are conducted under consistent standards and offer the institution's normal educational instruction to the general student population. Thus, Claimant argues that whether a school term is considered "regular" must be evaluated individually for each institution of higher learning.

Moreover, Claimant proclaims that the plain meaning of Section 402.1(1) of the Law aligns with the remedial nature of the Law as well as the intent behind the Section 402.1 disqualification. Claimant maintains that the General Assembly's intent in passing Section 402.1 of the Law was "to eliminate the payment of benefits to school employees during summer months and other regularly scheduled vacations, on the

---

[5] "'Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence.' *Miller v. Unemployment Comp. Bd. of Rev*[.], 83 A.3d 484, 486 n.2 (Pa. Cmwlth. 2014)." *Talty v. Unemployment Comp. Bd. of Rev.*, 197 A.3d 842, 843 n.4 (Pa. Cmwlth. 2018).

[6] United Academics of Philadelphia filed an *amicus curiae* brief.

4

rationale that such employees are able to anticipate and prepare for these nonworking periods." *Haynes v. Unemployment Comp. Bd. of Rev.*, 442 A.2d 1232, 1233 (Pa. Cmwlth. 1982). Claimant declares that she had no reason to anticipate that she would not be working during Employer's 2019 summer term because it was not a vacation period or period in which the normal curriculum is not offered; instead, her employment history reflects the opposite - that she had a reasonable and realistic expectation of working throughout both of the summer sessions.

United Academics of Philadelphia (Amicus) argues that because the landscape of higher education has changed since the enactment of Section 402.1(1) of the Law, and prevailing norms in higher education today demonstrate that contingent faculty teach summer term classes as regularly as fall or winter term classes, contingent faculty should, under the plain text of the Law, qualify for UC benefits when they lose summer term assignments, just as when they lose fall and winter term assignments.[7] Specifically, Amicus contends that, at the time Section 402.1(1) of the Law was enacted, smaller and more homogenous higher education institutions scheduled the vast majority of classes during formal fall and winter semesters and staffed those classes largely with tenured or tenure-track faculty; whereas, since 1979, new and different models of higher education have proliferated which include new types of providers which rely on and employ primarily contingent faculty.

Further, Amicus asserts that contingent faculty earn a fraction of what full-time faculty earn, and largely do not receive benefits like health insurance or retirement contributions, even while working more than forty hours per week. Crucially for this analysis, Amicus declares that contingent faculty enjoy no job stability, often learning mere weeks before summer, fall, and winter academic terms whether they will teach their scheduled classes. Tenured faculty who enjoy fair, stable pay, good benefits, and

---

[7] As Employer does not have a winter semester or term, it appears that Amicus treats *winter* as synonymous with *spring* when describing the class terms.

5

reliable assignments have been increasingly replaced by contingent faculty who enjoy none of those things.

Finally, Amicus maintains that COVID-19 has only exacerbated the existing trends in ways that highlight why contingent faculty should qualify for UC benefits for lost summer term classes, and why these benefits are crucial. It asserts that the burdens COVID-19 has imposed on colleges, universities, and other higher education institutions have fallen heavily on the shoulders of contingent faculty.

The UCBR rejoins that this Court has previously determined what constitutes a "regular term" as used in Section 402.1 of the Law in *Community College of Allegheny County v. Unemployment Compensation Board of Review*, 634 A.2d 845 (Pa. Cmwlth. 1993) (*CCAC*). The UCBR argues that the *CCAC* Court established factors to be considered in determining whether a summer term is a regular term. The factors are: (1) size of enrollment; (2) number of weeks the courses run; (3) availability of course subjects; (4) length of the summer session(s); and (5) whether the classes are contingent on enrollment.

Here, the UCBR contends that concerning the first factor, size of enrollment, fewer students were enrolled during Employer's 2019 summer term than its fall and spring semesters, which affected the number of summer classes Employer offered. The UCBR argues that this factor weighs against a conclusion that the summer term was a regular academic term. Regarding the second factor, number of weeks, the UCBR claims that because the summer term course offerings differed in length, being shorter than the fall and spring semesters, this factor weighs against a conclusion that the summer term was a regular academic term. With respect to the third factor, availability of course subjects, the UCBR asserts that fewer courses were offered in the summer term than the fall and spring semesters and there was also less availability of course subjects in the summer sessions. Therefore, the UCBR proclaims that this factor weighs against a conclusion that the summer term was a regular academic term. The

6

UCBR declares that because enrollment for the summer term was lower, the number of weeks shorter, and the availability of course subjects fewer, Employer's 2019 summer term at issue here was not a regular term.[8]

The UCBR maintains that Claimant worked in the spring semester and was given reasonable assurance of continued employment for the fall semester. The UCBR further declares that Employer's summer sessions were not a regular term as they failed to meet the applicable precedential factors. Thus, the UCBR asserts that Claimant is ineligible for UC benefits under Section 402.1(1) of the Law.

Initially, Section 402.1 of the Law provides, in relevant part:

> Benefits based on **service for educational institutions** . . . shall as hereinafter provided be payable . . . ; except that:
>
> (1)     With respect to service performed after December 31, 1977, in an instructional, research, or principal administrative capacity for an educational institution, **benefits shall not be paid based on such services** for any week of unemployment commencing during the period between two successive academic years, or during a similar period **between two regular terms whether or not successive** . . . , to any individual if such individual performs such services in the first of such academic years or terms and if there is a contract or a reasonable assurance that such individual will perform services in any such capacity for any educational institution in the second of such academic years or terms.

43 P.S. § 802.1 (emphasis added).[9]  Claimant does not dispute that she received a reasonable assurance that she would be working in Employer's 2019 fall semester. Rather, she argues that Employer's 2019 summer sessions were not "during the period

[8] Although the UCBR cites to *CCAC's* five factors, it only discusses three of the five factors in analyzing whether Employer's 2019 summer term was a regular term.

[9] Because Section 402.1(1) of the Law is a disqualifying provision, Employer has the burden of proving that the unemployment period began "during the period between two successive academic years, or during a similar period between two regular terms whether or not successive[,]" and that Claimant received "a reasonable assurance that [she would] perform services . . . in the second of such academic years or terms." *Id.*

between two successive academic years, or during a similar period between two regular terms[,]" because **the summer term is part of the academic year**, not "between two successive academic years[]"; and because **the summer term is a regular term**, not a term "between two regular terms." *Id*.

In *CCAC*, the claimant applied for UC benefits when he was unable to teach a summer course for Community College of Allegheny County (CCAC). The UC Service Center determined that he was eligible for UC benefits. The employer appealed, and a Referee affirmed the UC Service Center's determination. The employer appealed to the UCBR, which affirmed the Referee's decision. The employer appealed to this Court, which reversed the UCBR's order. The *CCAC* Court held: "[B]ecause the claimant was unemployed during a summer break, and had assurance of returning to work in the fall semester, he is not entitled to benefits." *Id*. at 848. The *CCAC* Court explained:

> In contrast to the fall and spring terms which each last fifteen weeks, courses offered in the summer may last 4, 6, 8 or 10 weeks. **Although two sessions are offered in the summer, not all of the campuses offer classes during both sessions. Three of the six campuses only offer courses during Summer Session I**.
>
> Courses offered in the summer require the same number of classroom hours and are given the same credits as those in other terms. However, **CCAC offers fewer classes in the summer. In the spring of 1991**, CCAC offered 13 oral communication classes at the Allegheny Campus, where the claimant worked, while during the summer[,] 6 classes were offered.
>
> Additionally, the 1991 spring and summer class schedules, which are a part of the record, indicate that the summer term is not the same as the other two. **Students attending CCAC during the spring who take at least [12] credits are considered full-time students, and pay a flat tuition rate. In the summer term, there is no distinction between full and part-time students; all of the students pay on a per credit basis**.

8

> **Although CCAC regularly offers classes during the summer**, **that fact does not mean that the summer period is a regular academic term**. In view of the significant decrease in enrollment during the summer, the definition of the academic calendar as consisting of a fall and spring term, and the varying lengths of course instruction in the summer, **we conclude that the period in question** - May 25, 1991 to June 22, 1991 - **is not a regular term**, **nor is it part of a regular term**.

*Id.* (emphasis added); *see also Glassmire v. Unemployment Comp. Bd. of Rev.*, 856 A.2d 269 (Pa. Cmwlth. 2004) (wherein this Court found the summer term was not a regular term because the employer's academic calendar consisted of two semesters - spring and fall, the employer had abbreviated summer sessions that were not part of the academic year, and while the claimant's classes may not have conformed to the traditional academic schedule, the claimant's employment was contingent on student enrollment which significantly decreased during the summer months).

More recently, in *Boyd v. Unemployment Compensation Board of Review* (Pa. Cmwlth. No. 205 C.D. 2018, filed November 20, 2018),[10] this Court addressed the same argument Claimant proffers herein. Relying on *CCAC*, this Court affirmed the UCBR's order denying UC benefits under Section 402.1(1) of the Law. Specifically, the *Boyd* Court expounded:

> First, [the c]laimant asserts that the [UCBR] erred by concluding that the summer term is not a regular term within the meaning of the Law. We disagree. The factual scenario at hand is similar to the one in [*CCAC*], wherein this Court found that a part-time professor was not eligible for benefits during the summer term because the school's summer term was not a regular term. [*CCAC*], 6[34] A.2d at 847. The Court did not deem [the] summer term to be a regular term because the courses offered in the summer had lower

---

[10] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), an unreported panel decision of this Court issued after January 15, 2008, may be cited for its persuasive value, but not as binding precedent.

9

enrollment, were shorter in duration, and were limited in number. Here, the [UCBR] found that the summer courses offered at the [e]mployer's campus were shorter in duration. The [UCBR] also found that the spring and fall terms are different from the summer [term]. Further, it found that the summer program course [the c]laimant was selected to teach was cancelled due to low enrollment. **Here**, **just as in** [*CCAC*], **the [UCBR] found that**: (1) **the offered summer courses are shorter in duration**; (2) **there is some evidence that at least one class ha**[d] **been cancelled due to low enrollment**; and (3) **at least one class was unavailable over the summer term**. **It follows**, **then**, **that the summer term is sufficiently distinguishable from the spring or fall academic terms and does not constitute a regular term within the meaning of Section 402.1 of the Law**.

*Boyd*, slip op. at 11 (citations omitted; emphasis added).

In the instant matter, the UCBR opined:

In her appeal, [] [C]laimant argues not all factors were met to conclude that [the] summer term[] [was] not [a] regular term[]. The Commonwealth Court has taken a narrow view as to what constitutes a summer term, holding that because a school's summer offerings differed from the spring and fall terms as to size of enrollment (lower), number of weeks (shorter), availability of course subjects (fewer), and was not listed in the catalog as a 'term,' the summer period was not a regular academic term. Here, [] [E]mployer credibly testified that '**there are significantly less courses offered in the summer session**[s].' **The school also operates on a 4-day work week schedule during the summer and 'resume**[s] **the regular 5-day work week schedule' in the fall**. It is clear that the summer is unlike the rest of the year at [] [E]mployer. [] [E]mployer *resumes* something that is *regular* after the summer period, demonstrating the summer period is indeed different.

UCBR Dec. at 1 (bold emphasis added). Further, the Referee concluded, and the UCBR adopted the conclusion: "Because of the holding in [*CCAC*], therefore, the [s]ummer term[] cannot be considered 'regular'[.]" Referee Dec. at 4.

10

Employer's witness testified before the Referee that there is a "drastic difference" in student enrollment in the fall and spring semesters compared to the summer sessions. C.R. Item 9, N.T. at 10. Employer's witness explained that although the college offers courses in the summer, the summer "is a break" for academic faculty and "[t]he college has less courses offered, and less students that enroll." C.R. Item 9, N.T. at 9. Further, Employer's College Catalog (Catalog) expressly referred to the fall and spring semesters as "[t]he major semesters." C.R. Item 9, N.T. Ex. C-3. The Catalog specifies that fall and spring semester classes run for 15 weeks, 10 weeks and 7 weeks, and the summer term classes run for 14 weeks and 7 weeks.[11] *See id.* The 15-week and 10-week courses offered during the fall and spring semesters are offered at the main and regional campuses and online, whereas only the 7-week courses offered in the summer are available at the main and regional campuses and online. *See* C.R. Item 2, Claimant Questionnaire, Employer's 2019 Term Start and End Dates at 3. Moreover, Claimant acknowledged during her testimony that summer class availability was dependent upon enrollment. *See* C.R. Item 9, N.T. at 14. Consequently, "because enrollment was down," not all faculty would teach during Employer's 2019 summer term. *Id.*

While some of the *CCAC* factors appear to overlap, the determinative issue is whether "the summer term is **sufficiently distinguishable** from the spring or fall academic terms and[, thus,] does not constitute a regular term within the meaning of Section 402.1 of the Law." *Boyd*, slip op. at 11 (emphasis added). Here, substantial evidence supports the UCBR's conclusion that, during the summer sessions, student enrollment was lower, fewer courses were offered at both the main and regional campuses, the course subject availability was less, the classes were contingent upon enrollment, and the Catalog defined the fall and spring semesters as major semesters.

___

[11] The seven-week classes offered in the fall and spring semesters are listed as "accelerated" while the seven-week classes offered in the summer are not. *Id.*

Accordingly, this Court concludes, after weighing the *CCAC* factors, that Employer's summer term is not a regular term under Section 402.1(1) of the Law.[12]

"Our General Assembly saw fit to disqualify school employees from receiving benefits during summer and other term breaks. It is settled law that teachers and other school employees not working during term breaks who can reasonably expect to return are not entitled to [UC] benefits." *Dep't of Educ., Scotland Sch. for Veterans' Children v. Unemployment Comp. Bd. of Rev.*, 578 A.2d 78 (Pa. Cmwlth. 1990) (citation omitted).

The Pennsylvania Supreme Court has explained:

> The intent of the legislature in passing Section 402.1 [of the Law] was to eliminate the payment of [UC] benefits to school employees during summer months and other regularly scheduled vacations, on the rationale that **such employees are able to anticipate and prepare for these non[-]working periods**. The [L]aw thus recognizes that these employees are not truly unemployed or suffering from economic insecurity during scheduled recesses.

*Slippery Rock Area Sch. Dist. v. Unemployment Comp. Bd. of Rev.*, 983 A.2d 1231, 1244 (Pa. 2009) (emphasis added) (quoting *Haynes*, 442 A.2d at 1233).

While this Court agrees that the UCBR properly relied on *CCAC* in determining that Claimant was ineligible for UC benefits under Section 402.1 of the Law, this Court also believes there should be some room for consideration of a claimant's "reasonable" expectation of employment during an institution's summer term based on an **employer's treatment of its summer term**, *not* **on a claimant's personal history**. This Court emphasizes that, here, Claimant is essentially arguing that she is entitled to UC benefits because she has worked every summer term, with the

---

[12] "The Court envisions that there could be a factual scenario where a summer term could be considered a regular term, but Claimant did not establish those circumstances in this case." *Boyd*, slip op. at 11 n.8.

12

exception of one, since 1991. However, Claimant has a level 14 seniority, i.e., the highest seniority in her Department, giving her priority over all other part-time instructors in her Department. Thus, she was more likely to work both summer sessions in 2019 than all other part-time faculty in her Department, yet she was only offered to teach one course. This fact belies Claimant's argument that Employer's summer term is a regular term based on her having worked virtually every summer since 1991, because part-time teaching faculty from level 1 through 13 have less of a probability, thus, less expectation, that they would teach during the summer term than Claimant. The issue herein is not whether Claimant reasonably expected to teach during the summer term, but whether Employer's summer term was a "regular" term for purposes of Section 402.1(1) of the Law.

Employer's witness testified that part-time adjunct (teaching) faculty members are considered 9-month employees, as opposed to counselors, librarians and advisors, who are considered 12-month (non-teaching) faculty members, due to the fact that they do not take breaks throughout the year. *See* C.R. Item 9, N.T. at 4-5. Further, Employer's witness explained: "[I]n the fall and the spring semester, we have about 22[,000[13]] students enrolled. In the summer [term], we're talking all sessions not semesters, about 2,000 students enroll. That's [a] drastic difference. Of course, the course offerings are significantly less." C.R. Item 9, N.T. at 10.

Importantly, Claimant confirmed that, in the almost 30 years that Employer has employed her, she has received "reasonable assurance of employment during the academic year for **a nine-month period**" from Employer, every year after the spring semester ended assuring her of work in the upcoming fall semester. C.R. Item 9, N.T. at 16 (emphasis added). Conversely, Claimant confirmed that she has

---

[13] Read in context, the "22" was clearly a typographical error in the transcript and 22,000 is the most logical number based on the testimony.

13

never received "written notice that [she] had reasonable assurance that [she would] work every summer[.]" C.R. Item 9, N.T. at 17.

Moreover, the preface to the Catalog expressly states:

The academic year begins in September and ends in August of the following year. **The major semesters**, **fall and spring**, **are 15 weeks in length**. The **fall semester** begins in September, and the **spring semester** begins in January. *Summer terms* are held between May and August.

**This calendar reflects *major* term dates and activities scheduled primarily at the Main Campus and the Regional Centers**. Term start and end dates, refund periods, the final day to drop course(s) without penalty of 'F' grade(s), and deadlines to change 'I' grades vary for all terms. For complete information, click here. The College is closed on Sunday. In addition, **the College is closed Friday and Saturday during the summer**.

C.R. Item 9, N.T. Ex. C-3 (bold and italic emphasis added).

The *CCAC* factors, in combination with the above testimony and Claimant's exhibit, establish that Claimant was aware Employer did not treat its summer term as a "regular" term. Thus, notwithstanding that Claimant has worked all but one summer term before 2019, she knew there was a possibility that she would not have employment during Employer's summer term. Indeed, Claimant testified:

C[laimant's] L[awyer]  [I]n the past, when are you usually alerted that whether or not you're going to be teaching a class? How far in advance?

C[laimant]  Well, that really depends. It varies, **depending upon the enrollment of the summer**, depending upon the number of full[-]time faculty members who have requested the class. I can be notified as early as April or as late as June.

C.R. Item 9, N.T. at 13 (emphasis added).

Section 402.1(1) of the Law expressly applies to "**service** . . . **in an instructional**, research, or principal administrative **capacity** for an educational

14

institution[.]" 43 P.S. § 802.1(1) (emphasis added).  Section 402.1(1) of the Law makes no differentiation between full-time and part-time instructional employees nor does it distinguish among the types of educational institutions.  Claimant is asking this Court to carve out an exception to Section 402.1(1) of the Law for part-time instructors at a postsecondary institution.

> However, we have no authority to add or insert language into a statute, *Burke ex rel. Burke v. Indep*[.] *Blue Cross*, . . . 103 A.3d 1267, 1273-74 ([Pa.] 2014), and 'it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include,' *Shafer Elec*[.] *& Constr*[.] *v. Mantia*, . . . 96 A.3d 989, 994 ([Pa.] 2014) (quoting *Commonwealth v. Rieck Inv*[.] *Corp*[.], . . . 213 A.2d 277, 282 ([Pa.] 1965)).

*Summit Sch., Inc. v. Dep't of Educ.*, 108 A.3d 192, 199 (Pa. Cmwlth. 2015).  "Although Claimant argues against the fairness of depriving part-time instructors [UC] benefits where they do not have the security of annual contracts, this is an argument better made to the General Assembly than to the courts."  *Glassmire*, 856 A.2d at 276 n.5.  Accordingly, this Court concludes that Claimant is ineligible for UC benefits under Section 402.1 of the Law.

For all of the above reasons, the UCBR's order is affirmed.

_____
ANNE E. COVEY, Judge

15

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Beverly Prunty,                          :
                    Petitioner           :
                                         :
            v.                           :
                                         :
Unemployment Compensation                :
Board of Review,                         :        No. 1761 C.D. 2019
                    Respondent           :

# O R D E R

AND NOW, this 4th day of May, 2021, the Unemployment Compensation Board of Review's November 26, 2019 order is affirmed.


_____
ANNE E. COVEY, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Beverly Prunty,                          :
                          Petitioner     :
                                         :
          v.                             :    No. 1761 C.D. 2019
                                         :    Argued: February 10, 2021
Unemployment Compensation                :
Board of Review,                         :
                          Respondent     :

BEFORE:    HONORABLE P. KEVIN BROBSON, President Judge
           HONORABLE MARY HANNAH LEAVITT, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge

CONCURRING OPINION
BY JUDGE LEAVITT                                    FILED: May 4, 2021


          The majority concludes that a summer academic term is not a "regular" term and, thus, Beverly Prunty (Claimant) is ineligible for unemployment compensation benefits under Section 402.1(1) of the Unemployment Compensation Law (Law).[1]  I agree with the outcome, given our longstanding precedent. Nevertheless, the "reasonable assurance" paradigm developed to determine the eligibility of full-time teachers for unemployment compensation makes little sense when applied to part-time teachers who become "unemployed through no fault of their own" for an academic term that takes place in the summer.  Section 3 of the Law, 43 P.S. §752.

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, added by Section 5 of the Act of July 6, 1977, P.L. 41, 43 P.S. §802.1.

Claimant has worked as a part-time adjunct faculty member in the English Department at the Community College of Philadelphia (College) since 1991. Throughout her employment, she has consistently taught classes in each of the College's three academic terms, *i.e.*, the Fall, Spring and Summer terms. The College's website states that "[t]he academic year begins in September and ends in August of the following year." Certified Record (C.R.), Item No. 9, C-3. Classes in the Fall and Spring terms may be 15, 10 or 7 weeks long; classes in the Summer term run for 14 or 7 weeks. However, all classes earn three academic credits and require the same number of hours in the classroom, regardless of the term in which they are offered. The College offers the same type of curriculum in all three terms. Claimant is paid the same amount for each class taught, regardless of whether it is a 14-week class in the Summer term or a 7-week class in the Spring term. Stated otherwise, all three terms are "regular" with regard to the type of course offerings and credit hours.

The College's part-time adjunct faculty members are not appointed for an academic year. Their hiring follows the same procedure for each of the three terms. The adjunct faculty member must submit a form prior to the onset of each term, in which she commits to be available to teach during the upcoming term. After the full-time faculty have selected their classes, adjunct faculty members are assigned the remaining classes in order of seniority within their particular department. Compensation is tied to the number of classes taught; part-time faculty are not paid an annual salary.

Since 2007, Claimant has customarily taught three or four classes in each of the three terms of the College. Specifically, she taught a total of 44 classes in the Fall term, 40 classes in the Spring term and 33 classes in the Summer term.

Because of variables related to student enrollment and the preferences of full-time faculty, Claimant often does not learn how many courses she will be teaching until days before the term's inception.

In advance of the 2019 Summer term, Claimant submitted her availability form to the College. In April of 2019, the College sent a letter to Claimant acknowledging the services she performed in the 2019 Spring term and providing her a reasonable assurance that she "will have the opportunity to perform a similar service during the Fall 2019 academic semester, dependent upon enrollment, budgetary considerations and performance." C.R., Item No. 9, C-1.

Claimant was assigned a single class during the 2019 Summer term, from May 11 through June 21, instead of the usual assignment of three or four classes. She filed an application for unemployment compensation based on her substantially reduced hours. On June 13, 2019, the Indiana Unemployment Compensation Service Center (Service Center) issued a Notice of Determination finding Claimant ineligible under Section 402.1(1) of the Law. The Notice explained that she was ineligible because her unemployment began between academic years, and the College provided her an offer of work in the next academic year. A second Notice stated that Claimant was liable for a non-fault overpayment of benefits because she was "INELIGIBLE TO COLLECT FOR SUMMER BREAK 2019 DUE TO INELIGIBLE REASONABLE ASSURANCE FROM COMMUNITY COLLEGE OF PHILADELPHIA." C.R., Item No. 5.

Section 402.1(1) of the Law states that unemployment benefits "based on service for educational institutions" are payable on the same terms as for other employees under the Law, except that:

> With respect to service performed … in an *instructional*, research, or principal administrative capacity for an educational

MHL-3

institution, benefits shall not be paid based on such services for any week of unemployment commencing *during the period between two successive academic years*, or during a *similar period between two regular terms* whether or not successive or during a period of paid sabbatical leave provided for in the individual's contract, to any individual if such individual performs such services in the first of such academic years or terms and if there is a contract or a *reasonable assurance that such individual will perform services in any such capacity for any educational institution in the second of such academic years or terms.*

43 P.S. §802.1(1) (emphasis added). Based upon Section 402.1(1), the Unemployment Compensation Board of Review found that Claimant was not "unemployed" during the Summer term of 2019. Employer's "reasonable assurance" that she "will have the opportunity to perform a similar service during the Fall 2019 academic semester" rendered her ineligible. C.R., Item No. 9, C-1.

Our Supreme Court has explained Section 402.1 of the Law as follows:

The intent of the legislature in passing Section 402.1 was to eliminate the payment of benefits to school employees during summer months and other regularly scheduled vacations, on the *rationale that such employees are able to anticipate and prepare for these non-working periods*. The law thus recognizes that these employees are not truly unemployed or suffering from economic insecurity during scheduled recesses.

*Slippery Rock Area School District v. Unemployment Compensation Board of Review*, 983 A.2d 1231, 1244 (Pa. 2009) (emphasis added) (quoting *Haynes v. Unemployment Compensation Board of Review*, 442 A.2d 1232, 1233 (Pa. Cmwlth. 1982)). Claimant argues that this rationale makes no sense when applied to part-time faculty whose wages are based on the number of classes taught, not an annual salary. Far from anticipating a "non-working" period for the 2019 Summer term,

MHL-4

*Slippery Rock*, 983 A.2d at 1244, Claimant anticipated that she would be working during this term as she had for many years.

Claimant further argues that the College's Summer term is part of its academic year, which runs from September to August; it is not a "break" between academic years. All three terms are "regular," at least with respect to the type of curriculum and credit hours offered, and Claimant has a long history of working all three terms. The loss of employment in any term causes her the same "economic insecurity," regardless of when it takes place. Section 3 of the Law, 43 P.S. §752. When Claimant was not assigned three or four classes in the 2019 Summer term, she suffered a "loss of wages" from "[i]nvoluntary unemployment." *Id.* Claimant argues that for part-time faculty, the period of ineligibility set forth in Section 402.1(1) of the Law should apply only to the periods between each of the three "regular terms" of the College.

As explained by *amicus curiae*, United Academics of Philadelphia, the landscape of higher education has evolved. The trend is toward more part-time instructors and a smaller tenured faculty. United Academics points out that in 1975, 25% of college instruction was done by part-time faculty; by 2011 that number exceeded 40%.[2] At the same time, part-time faculty "earn substantially less money than tenured and tenure-track faculty"; do not receive benefits like health insurance

---

[2] As part of its role in the administration of the Federal-State Unemployment Compensation Program, the Employment and Training Administration of the United States Department of Labor issues Unemployment Insurance Program Letters that interpret federal law requirements relating to unemployment compensation. *Montgomery County Head Start v. Unemployment Compensation Board of Review*, 938 A.2d 1137, 1140, n.6 (Pa. Cmwlth. 2007). In the Unemployment Insurance Program Letter 5-17 (December 22, 2016), Attachment III at 2, it was stated that during the 1975-1976 academic year, approximately 25% of instructors in institutions of higher education were part-time faculty; by 2011 that number had increased to over 40%.

or retirement contributions; and do not enjoy employment stability as do their tenured and tenure-track colleagues. *Amicus Curiae* Brief at 13.

Claimant and *amicus curiae* make excellent points and have identified a problem with the application of Section 402.1(1) of the Law to part-time faculty members. However, as the majority aptly observes, Section 402.1(1) makes no distinction between full-time and part-time instructional employees. *Prunty v. Unemployment Compensation Board of Review* (Pa. Cmwlth., No. 1761 C.D. 2019, filed May 4, 2021), slip op. at 15 (Maj.). It is for the legislature to consider whether Section 402.1(1)'s broad eligibility limitation imposed on all teachers, whether employed part-time or full-time, should be adjusted.

Given our precedent, the College's Summer term cannot be considered a "regular term" because of the greatly reduced student enrollment and commensurate fewer course offerings. Accordingly, I am constrained to agree with the majority's holding in this case.

_____
MARY HANNAH LEAVITT, President Judge Emerita

MHL-6